UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| RETURN MAIL, INC., | |
| Plaintiff, | NO. 11-130C |
| v. | THE HONORABLE JAMES F. |
| THE UNITED STATES | MEROW |
| Defendant. | |

**PLAINTIFF RETURN MAIL, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

### TABLE OF CONTENTS

I.    Introduction and Factual Background ................................................................ 1

    A.    Nature of the Action ................................................................................ 1

    B.    Background of the Invention .................................................................. 1

    C.    The Accused Postal Service OneCode ACS Service .............................. 3

    D.    Construction of  the Words and Phrases in a Patent Claim .................... 3

II.    Legal Standard .............................................................................................. 5

III.    Argument ....................................................................................................... 7

    A.    The Nature of the Parties' Disputes on Construction of the Claim Terms ............ 7

    B.    The Postal Service Processes and Handles "Returned Mail" ................ 8

        1.    "Subsequent to Mailing" has a Plain and Ordinary Meaning that Needs No Further Construction ................................................ 9

        2.    "Returned Mail Items" and "Mail Items Returned" Should Be Construed as "Items That Are Mailed and Come Back to a Post Office Facility" ................................................................. 13

        3.    "Undeliverable Mail Items"/"Identifying, As Undeliverable Mail Items" Should Be Construed As "Mail Items That Fail Attempted Delivery," and "Identifying, Mail Items That Fail Attempted Delivery," Respectively ...................................... 18

        4.    "Mail Items That Are Returned Subsequent To Mailing As Undeliverable" Should Be Construed As "Items That Are Mailed and Come Back to a Post Office Facility After Failed Attempted Delivery" ...................................................... 22

    C.    The Invention Is Not Limited To Steps Performed By a "Return Mail Service Provider" .......................................................................... 22

        1.    "Receiving From A Sender" Should Be Construed as "Receiving From a Subscriber" ................................................ 23

        2.    "Return Mail Service Provider" Should Be Construed as "Any Entity That Performs Electronic Return Mail Processing" ................ 25

    D.    "Address" Has a Plain and Ordinary Meaning and Needs No Further Construction ......................................................................... 27

i

E.      The Terms "Decoding"/"Decoded Information"/"Decoded Data" Should
        Be Construed as "Decipher Information Into Useable Form," "Deciphered,
        Usable Information," and "Deciphered, Useable Data," Respectively................. 32

F.      The Terms "If The Sender Wants A Corrected Address Provided" and "If
        The Sender Does Not Want a Corrected Address Provided" have Plain and
        Ordinary Meanings that Need No Further Construction....................................... 33

G.      "Posting Return Mail Data Records on a Network That Is Accessible to a
        Sender" has a Plain and Ordinary Meaning that Needs No Further
        Construction ...................................................................................................... 37

IV.    Conclusion ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282, 1288 (Fed. Cir. 2009)....................................................................6, 24, 34, 36

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800, 807 (Fed. Cir. 2007)........................................................................11, 12

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313, 1325 (Fed. Cir. 2003)........................................................................7

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006)...............................................................39

*Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) ...........................................................27, 31

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341, 1349 (Fed. Cir. 2001)........................................................................6

*CIAS, Inc. v. Alliance Gaming Corp.*,
504 F.3d 1356, 1360 (Fed. Cir. 2007)........................................................................34, 36

*CVI/Beta Ventures, Inc. v. Tura LP*,
112 F.3d 1146, 1160 (Fed. Cir. 1997)........................................................................6

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448, 1455-56 (Fed. Cir. 1998) .................................................................5

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270, 1275 (Fed. Cir. 2012)........................................................................15

*Hastings v. United States*,
78 Fed. Cl. 729, 733 (2007) .......................................................................................5

*Hoganas AB v. Dresser Indus., Inc.*,
9 F.3d 948, 950 (Fed. Cir. 1993)................................................................................7

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985, 989 (Fed. Cir. 1999)............................................................................5, 6

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356, 1364 (Fed. Cir. 1999)........................................................................37

iii

*KIS, S.A. v. Foto Fantasy, Inc.*,
    60 Fed. Appx. 319, 323 n. 3 (Fed. Cir. 2003) ........................................................34

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898, 906 (Fed. Cir. 2004) .....................................................................6

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc) ...............................................4, 7

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
    244 F.3d 1365, 1380 (Fed. Cir. 2001)..................................................................6

*Merck & Co. v. Teva Pharm. USA*,
    347 F.3d 1367, 1371 (Fed. Cir. 2003)..................................................................6

*Northern Telecom Ltd. v. Samsung Electronics Co.*,
    215 F.3d 1281, 1290 (Fed. Cir. 2000).............................................................7, 28

*Novartis Pharms. Corp. v. Abbott Labs.*,
    375 F.3d 1328, 1335 (Fed. Cir. 2004).............................................................7, 31

*O2 Micro Int'l v. Beyond Innovation Tech.*,
    521 F.3d 1351, 1362 (Fed. Cir. 2008)..................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303, 1314-19 (Fed. Cir. 2005) (en banc) ...................................... passim

*Schindler Elevator Corp. v. Otis Elevator Co.*,
    No. 09-cv-0560 (DMC), 2010 WL 199600, *6 (D.N.J. Jan. 13, 2010)...............5, 27

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362, 1368 .......................................................................................6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554, 1568 (Fed. Cir. 1997)..................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576, 1583 (Fed. Cir. 1996).............................................................14, 37

## I.      Introduction and Factual Background

### A.      Nature of the Action

This is a patent infringement case.  Return Mail, Inc. is the owner of U.S. Patent No. 6,826,548 C1 (hereinafter the '548 Patent), which relates to a system and method for processing returned mail.  Return Mail alleges the United States Postal Service ("USPS") is infringing certain claims of the patent; that is, Return Mail alleges the steps that the Postal Service takes to provide its OneCode ACS service fall within the scope of Claims 39 through 44 of the patent.

### B.      Background of the Invention

Every year, individuals and companies mail billions of envelopes, catalogues and packages with incomplete or incorrect addresses.  The mail service can intercept and redirect some of these items as they process outgoing mail.  For others, after attempting to deliver mail to an incomplete or incorrect address the item is returned to the mail service and either sent back to the addressee or destroyed.  This returned mail is a big, costly, and ultimately wasteful problem. And unless the addressing errors are corrected, it can only get worse (and more costly and more wasteful).

In 2000, Ralph Mitchell Hungerpiller and Ronald C. Cagle began developing a solution to this problem.  Their invention was built around the idea of scanning and processing coded information on returned mail.  This coding process allowed mailers to choose whether they wanted to receive information that could be used to obtain an updated address for each intended recipient and, if they did, to indicate that in a code on the mail they sent. This option also allowed the mailer to either seek updated addresses for intended recipients or simply purge intended recipients from a mailing list.

Hungerpiller and Cagle started a business called Return Mail, Inc. that offered this service to mailers.  Return Mail's technology proved to be successful.  Its customers were able to reduce the volume of undeliverable mail and reduce their postage expenses.

In January of 2001, Hungerpiller and Cagle began to seek protection for this invention by filing an application with the United States Patent and Trademark Office.  They successfully prosecuted the patent and were awarded U.S. Patent No. 6,826,548 in 2004.

Return Mail approached the Postal Service about using its technology.  The Postal Service asked Return Mail to partner with several large mailers in order to test how well its technology would integrate with Postal Service systems.  Although Return Mail successfully arranged for such tests, the Postal Service refused to complete these tests.  Instead, the Postal Service decided to provide returned mail services for free and refused to license Return Mail's patent.  The Postal Service then filed a petition with the Patent Office arguing the Patent Office should reexamine the '548 Patent and find it invalid as obvious.

On January 4, 2011, the Patent Office declined to find the patent invalid, cancelled the original claims, and issued the reexamination certificate with 24 new claims as U.S. Patent No. 6,826,548 C1.

The claims of this patent set or define the boundaries for the patented invention.  The claims asserted in this litigation (Claims 39 through 44) describe the invention.

Claim 42 is an example of a claim in issue.  We set out the claim below with the steps of the invention bolded:

> 42. A method for processing a plurality of undeliverable mail items, comprising:
> > **receiving** from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;

2

> **identifying**, as undeliverable mail items, mail items of the plurality of
> mail items that are returned subsequent to mailing as undeliverable;
> **decoding** the encoded data incorporated in at least one of the
> undeliverable mail items;
> **creating** output data that includes a customer number of the sender and at
> least a portion of the decoded data;
> **determining** if the sender wants a corrected address provided for intended
> recipients based on the decoded data;
> if the sender wants a corrected address provided, electronically
> **transferring** to the sender information for the identified intended
> recipients that enable the sender to update the sender's mailing address
> files; and
> if the sender does not want a corrected address provided, **posting** return
> mail data records on a network that is accessible to the sender to
> enable the sender to access the records.

## C.      The Accused Postal Service OneCode ACS Service

The Postal Service receives a plurality of mail pieces from a sender with "Intelligent

Mail" barcodes.  These barcodes contain information indicating whether the sender wants to

receive corrected address information.  Some of these mail pieces will be returned to the Postal

Service.  This can happen for a variety of reasons.  For example, some mail pieces will fail to be

delivered due to an incorrect address.  Delivery may also be refused.  The Postal Service will

decode information from the returned mail pieces.  If the sender has elected to receive corrected

address information, the Postal Service will provide this information to the sender.  If the sender

has elected not to receive corrected address information, the Postal Service will still post return

mail data records on the Postal Service's Rapid Information Bulletin Board System ("RIBBS")

website.

## D.      Construction of  the Words and Phrases in a Patent Claim

A first step in the process of determining whether the Postal Service's OneCode ACS

service falls within the boundaries of the claims at issue is to identify words or terms in the

claims that may need to be defined or construed to set the boundaries with precision.

3

In patent litigation, courts must determine the legal bounds of the claims of a patent in a process known as claim construction or the *Markman* hearing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc). Under Federal Circuit precedent, claim construction proceeds along a familiar route. The court looks first to "the claims themselves," and next to their "specification," and then, if necessary, the court may consider "the prosecution history" and "extrinsic evidence." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-19 (Fed. Cir. 2005) (en banc). The claims and specification are "[u]sually . . . dispositive" to this analysis, as the prosecution history "is less useful for claim construction purposes" because it "often lacks the clarity of specification." *Id.* at 1317. Similarly, extrinsic evidence "in general [is] less reliable" than intrinsic evidence, like the claim language and specification. *Id.* at 1315-18.

Turning back to Claim 42, we have bolded as examples the words and phrases one or both of the parties contends needs to be construed:

> 42. A method for processing a plurality of undeliverable mail items, comprising:
>> **receiving from a sender** a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected **address** to be provided for the addressee;
>> **identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;**
>> **decoding** the encoded data incorporated in at least one of the undeliverable mail items;
>> creating output data that includes a customer number of the sender and at least a portion of the decoded data;
>> determining if the sender wants a corrected **address** provided for intended recipients based on the decoded data;
>> **if the sender wants a corrected address provided**, electronically transferring to the sender information for the identified intended recipients that enable the sender to      update the sender's mailing address files; and

4

**if the sender does not want a corrected address provided, posting
return mail data records on a network that is accessible to the
sender** to enable the sender to access the records.

## II.    Legal Standard

Claim construction "'is a matter of resolution of disputed meanings and technical scope,

to clarify and when necessary to explain what the patentee covered by the claims.'" *O2 Micro

Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (quoting *U.S. Surgical

Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).  It is a matter of law for the court.

*Cybor Corp. v. FAS Techs., Inc.,*  138 F.3d 1448, 1455-56 (Fed. Cir. 1998).  Claim construction

focuses on what a person of ordinary skill in the art would have understood a given claim term to

mean at the time of the invention.  *Phillips,*  415 F.3d at 1313.  "It is not an obligatory exercise in

redundancy."  *Ethicon*, 103 F.3d at 1568.  "[D]istrict courts are not (and should not be) required

to construe *every* limitation present in a patent's asserted claims," *O2 Micro*, 521 F.3d at 1362.

When a claim term is "readily apparent to anyone reading the [patent,]" no construction is

necessary.  *Schindler Elevator Corp. v. Otis Elevator Co.*, No. 09-cv-0560 (DMC), 2010 WL

199600, *6 (D.N.J. Jan. 13, 2010).  However, as noted by this Court, "claim construction is

required only 'when the meaning or scope of technical terms and words of art is unclear . . . and

requires resolution to determine' the issue before the court."  *Hastings v. United States*, 78 Fed.

Cl. 729, 733 (2007) (quoting *Ethicon*, 103 F.3d at 1568).

Claim interpretation starts with the intrinsic evidence-the words of the claims themselves,

the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1313-17**.**  The important

element is the language of the claims.  There is a "heavy presumption in favor of the ordinary

meaning of claim language."  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985,

989 (Fed. Cir. 1999).  "[A] court must presume that the terms in the claim mean what they say,

and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of

claim terms." *Id.*  For this reason, the Federal Circuit has repeatedly affirmed decisions in which one party or the district court has declined to construe certain claim terms.  *See, e.g.*, *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1368 (finding no flaw with the patentee's argument that that the term "attached" does not require any construction); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (affirming where a district court "declined to construe 'melting'" because "the meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning"); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (affirming district court's refusal to construe 'irrigating' and 'frictional heat'").

In addition to the claim language, the specification is "the single best guide to the meaning of a disputed term." *Phillips*, 414 F.3d at 1315; *see also  Merck & Co. v. Teva Pharm. USA*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (observing that "terms in a patent document are construed with the meaning with which they are presented in the patent document."). Reading the specification to gain an understanding of the problem that the inventors were seeking to resolve is often a useful frame of reference.  *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997).  But the exercise of construing claims involves a more holistic approach than simply adding up competing sound-bites.

The Federal Circuit has cautioned that when consulting the specification to clarify the meaning of claim terms, courts must "take care not to import limitations into the claims from the specification." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).  Even where the specification only describes a single embodiment, the claim language is not to be limited to a single application "unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation and citation omitted); *see also Northern Telecom Ltd. v. Samsung Electronics Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) ("This court has repeatedly and clearly held that it will not read unstated limitations into claim language.").

In addition to the specification, the prosecution history constitutes intrinsic evidence that a court could also consider. *Markman*, 52 F.3d at 980. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Finally, while a court must consider intrinsic evidence, it may also consider extrinsic evidence such as dictionaries and expert testimony. *Id.* at 1317-18. Such sources, however, may never be used to "vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1335 (Fed. Cir. 2004). Importantly, whenever a court looks to evidence other than the claim term itself, it must be remembered that "[i]t is improper for a court to add extraneous limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) (quoting *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993)).

III. **Argument**

   A. **The Nature of the Parties' Disputes on Construction of the Claim Terms**

The claims of the '548 Patent use terminology with clear and well-understood meanings to a person of skill in the art, meanings supported by intrinsic and extrinsic evidence. Thus, the claim construction task for these claims ought to be straightforward.

Defendant, however, having lost its earlier attempt to invalidate the '548 Patent at the Patent Office, now seeks a second bite at the apple and advances constructions of claim terms that lack support in the record, add ambiguities, and obfuscate the '548 Patent in order to make the patent more difficult to enforce.  Most egregiously, Defendant repeatedly attempts to rewrite the claims to add two types of limitations.  First, it proposes to add a limitation that returned or undeliverable mail must be returned to the sender.  *See infra* Part III.B.  Such an interpretation for the claims is unsupported.  Second, the Defendant proposes to insert limitations requiring a return mail service provider to process mail.  *See infra* Part III.C.  In doing so, Defendant advances constructions that are inconsistent with the very inventions taught in the patent.  Only Return Mail proposes constructions that are faithful to the intrinsic and extrinsic evidence.

For each claim, Return Mail will set forth the claim and disputed claim terms.  Then, Return Mail will walk through the intrinsic evidence (*i.e.*, claim language, specification, and prosecution history) and the extrinsic evidence to demonstrate how the evidence supports Return Mail's construction.  Finally, Return Mail will demonstrate why Defendant's construction is not supported by the evidence and/or introduces ambiguity in the claim.

### B.     The Postal Service Processes and Handles "Returned Mail"

Return Mail submits that "returned mail" can be processed by the postal service and proposes constructions that are consistent with the intrinsic and extrinsic evidence.  Defendant counters with multiple constructions intended to create potential noninfringement positions by defining "returned mail" as something that cannot be processed by the postal service.  For example, Defendant would redefine the claim language "mail items that are returned subsequent to mailing as undeliverable" to include the following limitations: (1) the mail items must be "returned to the sender" rather than to a postal facility; (2) the postal service has finished processing these mail items; and (3) the mail items "could not be delivered by the postal service"

even with updated addresses.  Defendant's attempts to insert additional limitations should be rejected because they conflict with the claim language and the specification.  Moreover, Defendant's proposed definitions are inconsistent with the definitions for these terms found in the Postal Service's own glossary.

### 1. "Subsequent to Mailing" has a Plain and Ordinary Meaning that Needs No Further Construction

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claims 39-42: "subsequent to mailing" | Plain and ordinary meaning. To the extent that any construction beyond plain and ordinary meaning is required, RMI proposes the following construction: "after mailing." | After processing by the postal service. |

Claim 42 reads:

A method for processing a plurality of undeliverable mail items, comprising:
receiving from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;
identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned **subsequent to mailing** as undeliverable;
decoding the encoded data incorporated in at least one of the undeliverable mail items;
creating output data that includes a customer number of the sender and at least a portion of the decoded data;
determining if the sender wants a corrected address provided for intended recipients based on the decoded data;
if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to        update the sender's mailing address files; and
if the sender does not want a corrected address provided, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.

'548 Patent, Claim 42 (terms to be construed have been bolded).

"Subsequent to mailing" has a commonly understood meaning that is well supported by the record and requires no further construction.  In the event that the Court determines that a construction beyond plain and ordinary is required, subsequent to mailing should be construed to mean "after mailing."  Defendant's proposed construction of "after processing by the postal service" is packed with ambiguity and is not supported by the intrinsic or extrinsic evidence.

"Mailing" has a plain and ordinary meaning that is not uniquely defined in the '548 Patent, specification, or file history, and Defendant never proposed that the parties construe "mailing" standing alone.  *See, e.g.*, '548 Patent, fig. 4, 1:25-41, 2:15:20, 3:31-51, 5:29-39.  Nevertheless, Defendant insists on a construction that equates "mailing" with "processing."  But the intrinsic and extrinsic evidence make clear that "mailing" and "processing" are actually separate terms and cannot be substituted for one another.  Defendant's construction of "subsequent to mailing" as "after processing by the postal service" defies logic, the claim language itself, the intrinsic evidence, and the extrinsic evidence.

Nothing in the claim language suggests that "mailing" only occurs once a mail piece is "processed by the postal service."  Claim 39 includes no such limitation:  "A method for processing returned mail items sent by a sender to an intended recipient, the method comprising: decoding, *subsequent to mailing* . . . at least one of the returned mail items."  Claim 40 includes no such limitation:  "each associated with at least one of a plurality of mail items returned *subsequent to mailing* as being undeliverable."  Neither do Claims 41 and 42:  "A system for processing a plurality of undeliverable mail items comprising: a first detector, wherein the first detector detects, *subsequent to mailing*," and "identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned *subsequent to mailing* as undeliverable,"

10

respectively.  All that the plain language of the claims requires is that a step be performed "subsequent to mailing," not "after processing by the postal service."

Indeed, inserting Defendant's proposed construction into Claim 39 of the '548 Patent illustrates why Defendant cannot be right.  Specifically, Defendant's proposed construction would read:  "A method for processing returned mail items sent by a sender to an intended recipient, the method comprising: decoding, *after processing by the postal service . . .  on at least one of the returned mail items.*"  The ambiguity introduced is striking as the Claim now includes two mentions of "processing," presumably with different meanings, but no defined boundaries: What is processing? When does it start? When does it end?  As a result, the Court is left to guess what Defendant's use of "processing" means, thus creating rather than resolving ambiguity.

Moreover, that the claim language and specification include references to both "mailing" and "processing" confirms that these terms have different meanings.  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007) ("The intrinsic evidence of the specification therefore suggests that the patentees knew how to restrict their claim coverage . . .  They could have used the word 'perpendicular,' as they did in discussing their preferred embodiment.  Instead, they chose a different term that implies a broader scope.  The intrinsic evidence does not indicate that one of skill in the art would believe the patentees meant [one thing] when they said [the other].")  The claims here recite a method for "processing" returned mail, where one of the steps occurs "subsequent to mailing."  Such language makes clear that "mailing" retains its ordinary meaning and that "mailing" and "processing" have different meanings.  *See* '548 Patent, Claim 39 ("A *method for processing* returned mail items sent by a sender to an intended recipient, the method comprising: decoding, *subsequent to mailing* of the returned mail items"); Claim 41 ("*A system for processing* a plurality of undeliverable mail items comprising: a first detector, wherein the

first detector detects, *subsequent to mailing*"); Claim 42 ("A *method for processing* a plurality of undeliverable mail items, comprising: . . . identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned *subsequent to mailing* as undeliverable") (emphases added).

The specification further supports Return Mail's construction and makes clear that "mailing" and "processing" are different terms with different meanings.  Indeed, the portions of the specification cited by Defendant includes both the terms "mailing" and "processing."  *See* '548 Patent 2:15-20. In one such passage cited by Defendant, Return Mail described three primary steps to process returned or undeliverable mail, summarized here:  (1) mail items are found to be undeliverable "*subsequent to mailing*"; (2) those items are "loaded onto a transport mechanism and then optically scanned"; and (3) "[t]he optically scanned data is stored in a data file for *further processing.*"  *Id.*  The terms "mailing" and "processing" are not used interchangeably, yet the Defendant's construction would effectively do just that.  *See Acumed LLC*, 483 F.3d at 807-08.

Even Defendant's extrinsic evidence contradicts its construction.  As discussed, Defendant would have this Court believe that "subsequent to mailing" means "after processing by the postal service," where "subsequent" means "after" and "mailing" means "processing by the postal service."  Return Mail does not dispute that "subsequent" refers to a point later in time—subsequent is commonly understood as such and needs no additional construction—but Return Mail does dispute that "mailing" means "processing by the postal service."  Extrinsic evidence cited by Defendant demonstrates that "mailed, mailing, and mails" are defined as "to send by mail . . . to send postal material by mail." *The American Heritage College Dictionary*

817 (3d ed. 2000).  This definition does not even hint that "processing by the Postal Service" is a necessary condition precedent to an item being "mailed" or a person "mailing" a letter.

The claim language "subsequent to mailing" has a plain and ordinary meaning, thus no construction is necessary.  Not only is Defendant's construction unsupported, but it also adds ambiguity to otherwise clear words and has no support in the claim or the intrinsic and extrinsic evidence.  If further construction is necessary, the Court should adopt "after mailing."

2. **"Returned Mail Items" and "Mail Items Returned" Should Be Construed as "Items That Are Mailed and Come Back to a Post Office Facility"**

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| <u>Claim 39</u>: "returned mail items" | Items that are mailed and come back to a post office facility. | Mail items returned to the sender after processing by the postal service. |
| <u>Claim 40</u>: "mail items returned" | Items that are mailed and come back to a post office facility. | Mail items returned to the sender after processing by the postal service. |

Claim 39 reads:

> A method for processing returned mail items sent by a sender to an intended recipient, the method comprising:
> > decoding, subsequent to mailing of the **returned mail items**, information indicating whether the sender wants a corrected address to be provided for the intended recipient, on at least one of the returned mail items;
> > obtaining an updated address of the intended recipient subsequent to determining that the sender wants a corrected address to be provided for the intended recipient; and
> > electronically transmitting an updated address of the intended recipient to a transferee, wherein the transferee is a return mail service provider.

Claim 40 reads:

> A computer program product residing on a computer readable medium comprising instructions for causing a computer to:

store decoded information indicating whether a sender wants a corrected
address to be provided and a customer number, each associated with at
least one of a plurality of **mail items returned** subsequent to mailing
as being undeliverable;

determining from the decoded data that the customer wants a corrected
address to be provided for at least one of the plurality of undeliverable
mail items;

receive an updated address of an intended recipient for at least one of the
plurality of undeliverable mail items, subsequent to and based upon
the determining step; and

transmit the updated address to a transferee, wherein the transferee is a
return mail service provider.

'548 Patent, Claims 39, 40 (terms to be construed have been bolded).

Return Mail's construction that "returned mail items" and "mail items returned" are "items that are mailed and come back to a post office facility" is consistent with the intrinsic and extrinsic evidence.  Claim 39 and 40 both indicate that the mail items must come back to the post office because the mail items are "returned."   However, nothing in Claims 39 and 40 suggests that the returned mail items need to be returned back to the sender after processing by the postal service.

Indeed, the patent explicitly describes an embodiment where "returned mail" is never "returned to the sender."  This embodiment describes that mail can be "returned by the post office to the return mail service provider offering the processing services of the present invention."  '548 Patent 3:21-26.  An alternative embodiment provides that a sender "can elect to receive its own returned mail, bundle it together, and then deliver it to the return mail service provider."  *Id.*  Because Defendant's proposed construction would read a preferred embodiment out of the scope of the claims, it should be rejected.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  "Returned mail" therefore can be, but does not have to be, returned to the sender.

Further, the claim language demonstrates the "returned mail" has not been "returned to the sender." Instead, certain claims explicitly recite other relationships between the mail items and the sender. Claim 39 addresses "returned mail items sent by a sender," and the first limitation of Claim 42 is "receiving from a sender a plurality of mail items." Because the claims explicitly recite otherwise apparent relationships between "returned mail items" and the sender (*e.g.*, "sent by a sender"), it would be inconsistent for the term "returned mail items" to contain an implicit relationship to a sender, especially one that is not otherwise apparent. *Phillips*, 415 F.3d at 1314 ("To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."); *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) ("[T]he reference in some claims to a 'registration server being further characterized in that it is free of content managed by the architecture' strongly implies that the term 'registration server,' standing alone, does not inherently mean a server that is free of managed content.").

Defendant also incorrectly suggests that mail does not become "returned" until "after processing by the postal service." This proposal conflicts with the claim language and the specification. Claims 39 and 40 both state that returned mail processing happens "subsequent to mailing," and not, as Defendant proposes, "after processing by the postal service." As explained in the previous section, reading this additional temporal limitation into the claims would be inconsistent with the express use of the word "processing" to describe the handling of "returned mail items" in Claim 39.

Further, the specification demonstrates that "returned mail items" have "come back to a postal facility," and become "returned" before the postal service has finished processing them. Figure 1 shows that "returned mail (block 15) is received from the United States Postal Service

15

(block 90) and passed through a high volume mail sorter 20 and optical scanner 40 by return

mail sorter and data processing operators 30." '548 Patent 3:32-36.   The "returned mail" in

block 15 is therefore collected by the Postal Service and delivered to a return mail service

provider before the Postal Service has finished processing it.



FIG. 1

Further, extrinsic evidence offered by both sides confirms the superiority of Plaintiff's

construction.  The United States Postal Service's *Glossary of Postal Terms* defines "return mail"

as "[m]ail that must be sent in the opposite direction for proper dispatch" and further notes that

"return mail" is also called "turnback mail."  Ex. D, United States Postal Service, *Glossary of*

*Postal Terms*, Publication 32, May 1997, at 100.  "Returned mail" would therefore be mail that

has been sent in the opposite direction or put simply, mail that has been turned back.  According

to Defendant's own glossary, the mail does not need to be returned to the sender, and the Postal

Service does not need to finish processing the mail in order for it to become returned.  Moreover,

the Postal Service glossary notably lacks a term to describe mail that is headed back to the sender

but still being processed by the Postal Service.  Plaintiff's proposed definition that the mail items "come back to a postal service facility" more closely aligns with the Postal Service's definition of "return mail" or "turnback mail."

Finally, a Return Mail business plan demonstrates that its processes for handling returned mail could be implemented by the Postal Service, and therefore returned mail could be processed by the Postal Service.  This 2000 business plan that the inventors presented to Lockheed Martin states that "Return Mail plans to license its processes and application program interfaces to the USPS."  Ex. E, Return Mail Inc., Business Plan Presentation to Lockheed Martin Distribution Technologies, July 13, 2000, RMI-00009170, 9178.  This supports Return Mail's position that the invention applies to mail that has only come back to a postal facility.

In addition, Plaintiff's proposed construction offers a precise definition that mail items are "returned" if they have been mailed and then come back to a post office facility, unlike Defendant's construction, which fails to define more precisely what it means for a mail item to be "returned."

Defendant's proposed construction is an apparent attempt to create a noninfringement argument by defining "returned mail items" chronologically "after processing by the postal service."  This focus on whether the postal service has finished processing is inappropriate because the invention focuses on processing returned mail "subsequent to mailing", not processing mail subsequent to postal service processing.  This context in which the term "returned mail items" is used "can be highly instructive."  *Phillips*, 415 F.3d at 1314.

**3.** **"Undeliverable Mail Items"/"Identifying, As Undeliverable Mail Items" Should Be Construed As "Mail Items That Fail Attempted Delivery," and "Identifying, Mail Items That Fail Attempted Delivery," Respectively**

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claims 40-43: "undeliverable mail items" | Mail items that fail attempted delivery. | Mail items that could not be delivered by the postal service. |
| Claim 42: "identifying, as undeliverable mail items" | Identifying, mail items that fail attempted delivery. | Identifying, mail items that could not be delivered by the postal service. |

Claim 42 reads:

A method for processing a plurality of **undeliverable mail items**, comprising:
receiving from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;
**identifying, as undeliverable mail items**, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;
decoding the encoded data incorporated in at least one of the **undeliverable mail items**;
creating output data that includes a customer number of the sender and at least a portion of the decoded data;
determining if the sender wants a corrected address provided for intended recipients based on the decoded data;
if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to        update the sender's mailing address files; and
if the sender does not want a corrected address provided, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.

'548 Patent, Claim 42 (terms to be construed have been bolded).

Return Mail's construction of "undeliverable mail items" comports with the plain meaning of the terms and provides greater clarity than Postal Service's proposed construction.[1] To be "undeliverable," a mail item merely needs to have failed attempted delivery. The government's construction, which suggests that an undeliverable mail item may never again become deliverable, introduces undue ambiguity and confusion, and should be rejected.

The claim language supports Return Mail's construction of the term "undeliverable." That language establishes that an "undeliverable mail item" is mail that failed at least one attempt at delivery. The relevant claim language for Claim 42 provides (emphases added for all claims): "*identifying, as undeliverable mail items*, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable" and "decoding the encoded data incorporated in at least one of the *undeliverable mail items*." Similarly, the program of Claim 40 identifies that the "customer wants a corrected address to be provided for at least one of the plurality of *undeliverable mail items*" and then "receive[s] an updated address of an intended recipient for at least one of the plurality of *undeliverable mail items*." Same for Claim 41: "encoded information on at least one of the plurality of mail items indicating whether a sender wants a corrected address to be provided for at least one of the *undeliverable mail items*." Finally, Claim 43 also supports Return Mail's construction: "in order to obtain an updated address for each intended recipient of an *undeliverable mail item*."

The key distinction in Return Mail's dispute with Defendant here is that Defendant's construction—"mail items that could not be delivered by the postal service"—suggests a mail item can never be deliverable once it is "undeliverable," whereas Return Mail's construction—

---

[1] The parties agree that "identifying" means "identifying." Thus, the only difference between the proposed constructions lies in the meaning of "undeliverable mail items," which is a term used in Claims 40, 41, 42 and 43.

"mail items that fail attempted delivery"—does not.  There is no basis to read Defendant's proposed limitation into the claim itself and the Court should reject Defendant's construction.

The specification supports Return Mail's construction that "undeliverable" mail fails attempted delivery.  *See, e.g.*, '548 Patent 2:6-26 (detailing address correction for mail items that could not be delivered).  For example, the specification teaches that an undeliverable mail item with decoded data may be scanned to determine whether an updated and accurate address exists for an addressee.  *See* '548 Patent 3:32-57.  If there is an updated address, a mailer "may use th[e] updated information as it deems appropriate . . . [including to] produce immediate re-mailings of the invoices or other mail that originally was returned by the post office as undeliverable."  *See* '548 Patent 4:26-31.  Defendant's "once undeliverable always undeliverable" construction contravenes the '548 Patent specification, which specifically contemplates updating a once undeliverable mailpiece to allow for re-delivery.

Furthermore, the prosecution history supports Return Mail's construction.  During the reexamination proceeding, Return Mail argued that the prior art cited by the examiner only considered address correction *before* delivery.  In other words, the prior art did not suggest that mail would be returned as undeliverable *after* an attempted delivery, because change-of-address mail is corrected before reaching an incorrect destination.  *See*  Ex. B, November 9, 2009 Amendments and Reconsideration, pp. 39-41 ("Pintsov discloses a technique that relies on the unique numeric identifier to provide a fundamentally different approach than that of the claimed invention. More particularly, Pintsov does not teach or suggest that mail is '**<u>returned</u>** as being undeliverable.' Instead, Pintsov discloses that '**change-of-address mail never reaches the old, incorrect destination**, but is intercepted at a very early point in the mail processing cycle.").  This invention, however, is different than the prior art.  Instead of simply correcting addresses

20

*before* the attempted delivery of a mailpiece, this invention contemplates mail that fails delivery and needs correction *after* an attempted delivery.  This comports with Return Mail's proposed construction of "undeliverable."

Finally, the extrinsic evidence supports Return Mail's construction as well.   The Postal Service's *Glossary of Postal Terms* states that mail that is "undeliverable as addressed" is "[m]ail that the USPS cannot deliver *as addressed*."  Ex. D, Publication 32, May 1997, at 121.  From this description, the *Glossary of Postal Terms* leaves open the possibility that an "undeliverable mail item" may be corrected and become deliverable.  Return Mail's construction agrees with Defendant's own glossary, whereas Defendant's "once undeliverable, always undeliverable" construction does not.

Return Mail's construction finds support in the claim language, the intrinsic evidence and the extrinsic evidence.  Furthermore, it provides clarity and avoids adding the unnecessary ambiguity found in Defendant's construction.  As stated above, Defendant's construction fails to account for the fact that address correction can occur *after* an initial failed delivery attempt and it is unclear whether "undeliverable" refers to mail that can never be delivered by the postal service (*i.e.*, mail from which the sender or return mail service provider cannot receive a correct address) or mail that failed an attempt at delivery.  Thus, this Court should adopt Return Mail's construction of "undeliverable mail items" and "identifying, undeliverable mail items" as "mail items that fail attempted delivery," and "identifying, mail items that fail attempted delivery," respectively.

4.     **"Mail Items That Are Returned Subsequent To Mailing As Undeliverable" Should Be Construed As "Items That Are Mailed and Come Back to a Post Office Facility After Failed Attempted Delivery"**

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| <u>Claims 39-42</u>: "mail items that are returned subsequent to mailing as undeliverable" | Items that are mailed and come back to a post office facility after failed attempted delivery. | Mail items returned to the sender because they could not be delivered by the postal service. |

The parties propose constructions for the term "mail items that are returned subsequent to mailing as undeliverable."  As argued above, the parties have proposed constructions for "mail items returned" (*see supra* Section III.B.2), "subsequent to mailing" (*see supra* Section III.B.1), and "undeliverable mail items"  (*see supra* Section III.B.3).  For the reasons set forth above, Return Mail proposes that "mail items that are returned subsequent to mailing as undeliverable" be construed as "items that are mailed and come back to a post office facility after failed attempted delivery," a construction that is faithful to the intrinsic and extrinsic evidence.

C.     **The Invention Is Not Limited To Steps Performed By a "Return Mail Service Provider"**

Plaintiff proposes defining the term "return mail service provider" according to the customary meaning of these terms in light of the intrinsic and extrinsic evidence.  Defendant's constructions attempt to create two types of noninfringement arguments: first, Defendant defines "return mail service provider" to exclude the Postal Service even though the Postal Service performs electronic return mail processing; and second, Defendant inserts this overly restrictive definition of "return mail service provider" into claims that do not even recite the "return mail service provider" limitation.  Defendant's proposed constructions should be rejected as inconsistent with the intrinsic evidence.

22

### 1. "Receiving From A Sender" Should Be Construed as "Receiving From a Subscriber"

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claims 42: "receiving from a sender" | Receiving from a subscriber | A return mail service provider receives from a subscriber |

Claim 42 reads:

> A method for processing a plurality of undeliverable mail items, comprising:
> **receiving from a sender** a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;
> identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;
> decoding the encoded data incorporated in at least one of the undeliverable mail items;
> creating output data that includes a customer number of the sender and at least a portion of the decoded data;
> determining if the sender wants a corrected address provided for intended recipients based on the decoded data;
> if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to update the sender's mailing address files; and
> if the sender does not want a corrected address provided, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.

'548 Patent, Claim 42 (terms to be construed have been bolded).

The parties agree that construction of "receiving from a sender" includes the limitation "receiving from a subscriber," and accordingly, Return Mail proposes that receiving from a sender" be construed as "receiving from a subscriber."[2] Defendant's proposal improperly imports the additional limitation "return mail service provider" into its construction,

---

[2]     The parties have agreed that "sender" shall be construed as "subscriber."

thus requiring the mail items to be received by a return mail service provider.  This is unsupported by any of the intrinsic or extrinsic evidence cited by Defendant.

The claim language and specification supports Return Mail's construction.  Nothing in the intrinsic evidence limits the invention or the claim to processing undeliverable mail that a return mail service provider receives from a subscriber.  Indeed, Claim 42 recites a "method for processing a plurality of undeliverable mail items, comprising: receiving from a sender a plurality of mail items." The plain language in no way limits who receives from a sender.  The specification further supports Return Mail's construction that the mail items must be received from the sender/subscriber; it does not limit who received mail items from a sender.  *See* '548 Patent 1:20-31 (describing "the present invention relates generally to mail processing, and more particularly to a method, system, and program product for processing business mail that is returned to the sender due to an inaccurate or expired address for the intended recipient); *see also* '548 Patent 1:39-47, 3:3-6, 4:50-61, 5:7-44 (explaining return mail system and not limiting which entity receives mail from a sender).  The claim language supports Return Mail's construction that "receiving from a sender" should be given its ordinary meaning.

By contrast, Defendant imports limitations from the specification into the claim term. According to Defendant's construction, return mail service providers receive a plurality of mail from a sender in Claim 42.  Nothing in the claim language or the specification states that only return mail service providers receive a plurality of mail.  Indeed, to support its construction, Defendant cites to figures and descriptions of "exemplary embodiments."  *See* '548 Patent, figs. 1, 2, 4, and 5.  This is insufficient.  Courts must "take care not to import limitations into the claims from the specification."  *Abbott Labs.*, 566 F.3d at 1288.

### 2. "Return Mail Service Provider" Should Be Construed as "Any Entity That Performs Electronic Return Mail Processing"

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claims 39-41: "return mail service provider" | Any entity that performs electronic return mail processing. | An entity that processes mail returned to the sender by the postal service. |

Claim 39 reads:

> A method for processing returned mail items sent by a sender to an intended recipient, the method comprising:
>> decoding, subsequent to mailing of the returned mail items, information indicating whether the sender wants a corrected address to be provided for the intended recipient, on at least one of the returned mail items;
>> obtaining an updated address of the intended recipient subsequent to determining that the sender wants a corrected address to be provided for the intended recipient; and
>> electronically transmitting an updated address of the intended recipient to a transferee, wherein the transferee is a **return mail service provider**.

'548 Patent, Claim 39 (terms to be construed have been bolded).

Return Mail's construction of "return mail service provider" is "any entity that performs electronic return mail processing." This interpretation is supported by the claim language, as well as the specification and prosecution history. Claims 39-41 require that an updated address be sent to a transferee, "wherein the transferee is a return mail service provider." Moreover, the specification and file history further compel Return Mail's construction that no additional limitation regarding the other entities involved in returning mail is necessary. Indeed, the specification makes clear that return mail service provider can process mail items that have not been returned to the sender by the postal service. *See, e.g.*, '548 Patent 3:24-27 ("Accordingly, when a piece of mail is undeliverable for any reason, it is returned by the post office to the return mail service provider offering the processing services of the present invention.").

It is also clear from these sources that a "return mail service provider" process return mail. In addition, the claims recite that the updated address is "electronically transmitt[ed]" or that the computer program receives or sends an updated address. *See* '548 Patent, Claims 39-41; *see also* '548 Patent 2:6-11 (return mail service provider captures data from the barcode and then electronically transfers corrective data records). Such a limitation makes clear that the processing of return mail occurs electronically.

There are two key differences between Defendant's construction and Return Mail's construction. First, the government improperly imports the limitation that the return mail service provider processes mail that is returned to the sender by the postal service. To arrive at such a construction, Defendant must improperly import limitations from the specification. Neither the claim, nor the written description of the invention, require that the mail items to be processed must be returned to the sender by the postal service. Indeed, the specification makes clear that the sender delivering return mail to the return mail service provider is just <u>one</u> of the ways that the return mail service provider receives the return mail. *See* '548 Patent 3:21-34.

Second, the government's construction fails to note that return mail processing occurs electronically rather than manually. As explained above, the claim language makes clear that the return mail processing occurs electronically. Accordingly, this Court should adopt Return Mail's construction.

26

### D.     "Address" Has a Plain and Ordinary Meaning and Needs No Further Construction

| Relevant Claim Term | RMI's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| <u>Claims 39-44</u>: "address" | Plain and ordinary meaning.<br><br>To the extent that any construction beyond plain and ordinary meaning is required, RMI proposes the following construction: "The location to which the USPS is to deliver or return a mailpiece." | Street name and house number, city, state, and postal code. |

Claim 42 reads:

A method for processing a plurality of undeliverable mail items, comprising:
    receiving from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected **address** to be provided for the addressee;
    identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;
    decoding the encoded data incorporated in at least one of the undeliverable mail items;
    creating output data that includes a customer number of the sender and at least a portion of the decoded data;
    determining if the sender wants a corrected **address** provided for intended recipients based on the decoded data;
    if the sender wants a corrected **address** provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to          update the sender's mailing **address** files; and
    if the sender does not want a corrected **address** provided, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.

'548 Patent, Claim 42 (terms to be construed have been bolded).

"Address," a claim term that appears in all of the infringed claims, needs no construction

as it is "neither unfamiliar . . . confusing . . . nor affected by the specification or prosecution

27

history." *Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 528 F.

Supp. 2d 967, 976 (N.D. Cal. 2007).  "No construction is necessary when a claim term is

"readily apparent to anyone reading the [patent]." *See Schindler Elevator Corp.*, 2010 WL

199600, at *6.  To the extent that the Court seeks a construction of "address," the proper

construction is "the location to which the USPS is to deliver or return a mailpiece."  By contrast,

Defendant proposes a construction that "address" shall be construed as "street name and house

number, city, state, and postal code."  Such a construction introduces limitations not supported in

the record, including the support cited by Defendant.  Accordingly, this Court should adopt

Return Mail's proposed construction.

Reading "address" in the context of the claim and specification, it is apparent that no

construction is necessary, as the term "address" is readily understood.  *See, e.g.*, Claim 39

("information indicating whether the sender wants a corrected address to be provided for the

intended recipient");  Claim 42 ("encoded data indicating whether the sender wants a corrected

address to be provided for the addressee").  In both Claims 39 and 42, there is no doubt that

"address" means "address."

As mentioned, Defendant would have this Court construe "address" as a "street name and

house number, city, state, and postal code."  Inserting that construction into the '548 Patent,

however, adds significant limitations that claim language cannot bear.  *Northern Telecom Ltd.*,

215 F.3d at 1290 (Fed. Cir. 2000) ("This court has repeatedly and clearly held that it will not

read unstated limitations into claim language.").  Mailing instructions provided by the legislative

branch of the United States government show why such a construction is absurd.  For example,

the United States Senate's website includes a page instructing constituents on how to mail a

letter to their senator.  It clearly states that constituents can "direct postal correspondence to [their] senator as follows:

> The Honorable (Name)
> United States Senate
> Washington, D.C. 20510."

*See* "U.S. Senate: Reference Home >How to… contact U.S. Senators," *available at* http://www.senate.gov/reference/common/faq/How_to_contact_senators.htm (last accessed 8/30/2012).  Similarly, a Maryland or Virginia taxpayer filing an IRS 1040 form without an accompanying payment is instructed to send the completed document to:

> Department of the Treasury
> Internal Revenue Service
> Kansas City, MO 64999-0002

*See* "Where to file Addresses for Taxpayers and Tax Professionals Filing Form 1040," *available at* http://www.irs.gov/uac/Where-to-File-Addresses-for--Taxpayers-and--Tax-Professionals-Filing-Form-1040.  Notably absent from the IRS's and a United States senator's address (as the term is ordinarily understood) are two of the elements that the Postal Service now argues are necessary for an "address" to be an "address": a street name and house number.  The claim language provides no basis for adopting Defendant's restrictive construction of "address."

The specification further supports Return Mail's construction.  In fact, both Return Mail and Defendant cite the same portions of the specification to support their respective positions. *See* Dkt. No. 39-2, at 1.  Notably, all of the cited passages use the claim term "address," but nowhere is address restricted to mean to a "street name and house number, city, state, and postal code."  For example, the specification states "information related to the address history of the addressee," "[a] subscriber . . . also includes on each piece of mail . . . a written return address, and "then the return mail application server then sends the returned mail data records to an address update service." '548 Patent 3:3-10, 3:16-18, 4:63-67.  The specification clearly employs

29

"address" to mean "address" and contains no support for the restrictive construction that Defendant would have this Court adopt.

The prosecution history also supports Return Mail's position that "address" maintains its plain and ordinary meaning. For example, in the June 8, 2010 amendments and reconsideration, Return Mail distinguished its invention from the Postal Service's PARS system on the basis that the '548 Patent discloses an address correction paradigm "that start[s] with an incorrectly addressed mail item that is first mailed, then returned for address correction, and subsequently re-mailed to the intended recipient for delivery." Ex. C, June 8, 2010 Amendments and Reconsideration, pp. 65-69. Absent from Return Mail's use of the term "address" in the prosecution history is any suggestion that an "address" must be comprised of a "street name and house number, city, state, and postal code." As the term is used in this prosecution history, "address" clearly means the location to which the Postal Service is to deliver or return a mailpiece, which may or may not include the house-number or street-name elements that Defendant asks this Court read into the '548 Patent.

Both Return Mail and the Postal Service cite to the *Glossary of Postal Terms* for support for their respective positions. In that publication, the Postal Service itself defines "address" as *"[t]he location to which the USPS is to deliver or return a mailpiece.* It consists of certain elements *such as* recipient name, street name and house number, and city, state, and ZIP Code as required by the mail class." *Glossary of Postal Terms*, Pub. 32, May 1997, pg. 5 (emphasis added); *accord The American Heritage College Dictionary* 15 (3d ed. 2000) (defining "address" as "[t]he written directions on mail indicating destination" or "the location at which a person or organization may be found or reached."). Interestingly, Defendant selectively chose to adopt "street name, house number, city, state, and postal code," from its own Postal Service *Glossary*

30

*of Postal Terms*, but failed to include the qualifiers "such as" and "as required by the mail class." These are important.  The "such as" qualifier indicates that each element in the definition's list of address components are illustrative, not necessary.  Return Mail does not dispute that the plain and ordinary meaning of "address" might incorporate a house number or street name, but as the IRS and United States Senate examples show, those elements are not necessary and Defendant's selective reading of its own *Glossary of Postal Terms* cannot be correct.  Similarly, the glossary's inclusion of the phrase "as required by the mail class," suggests that the specific elements of an "address" change depending on the mail class.  There is no room for mail-class differences in Defendant's construction; there is in Return Mail's.  Finally, to the extent that Defendant's construction of "address" is based on its selective reading of its own *Glossary of Postal Terms*, it should be noted that extrinsic evidence may never be used to "vary, contradict, expand, or limit the claim language from how it is defined, even by implication." *Novartis Pharms. Corp*., 375 F.3d at 1335.

By proposing a construction of the term "address" that includes "street name and house number, city, state, and postal code," the Postal Service would have this Court improperly deviate from the plainly understood meaning of "address" by importing limitations that are simply not supported by the relevant evidence.  "Address" is a term that needs no construction as it is "neither unfamiliar . . . confusing . . . nor affected by the specification or prosecution history." *Bd. of Trustees of Leland Stanford Jr. Univ.*, 528 F. Supp. 2d at 976.  To the extent that the Court seeks a construction of "address," the proper construction is "the location to which the USPS is to deliver or return a mailpiece."

**E.    The Terms "Decoding"/"Decoded Information"/"Decoded Data" Should Be Construed as "Decipher Information Into Useable Form," "Deciphered, Usable Information," and "Deciphered, Useable Data," Respectively**

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claims 39, 42: "decoding" <br> Claim 41: "decode" | Decipher information into useable form | Convert information into useable form. |
| Claim 40: "decoded information | Deciphered, usable information | Information converted into useable form. |
| Claim 40: "decoded data" | Deciphered, useable data | Information converted into useable form. |
| Claim 42: "decoded data" | Deciphered, useable data | Information converted into useable form. |

Claim 39 reads:

> A method for processing returned mail items sent by a sender to an intended recipient, the method comprising:
> **decoding**, subsequent to mailing of the returned mail items, information indicating whether the sender wants a corrected address to be provided for the intended recipient, on at least one of the returned mail items;
> obtaining an updated address of the intended recipient subsequent to determining that the sender wants a corrected address to be provided for the intended recipient; and
> electronically transmitting an updated address of the intended recipient to a transferee, wherein the transferee is a return mail service provider.

'548 Patent, Claim 39 (terms to be construed have been bolded).

The parties appear to be close to agreement on the proper construction of "decode" and "decoded information."  Plaintiff Return Mail contends that "decode" means "decipher information into usable form," and that "decoded information" is "deciphered, usable information."  The claim language is explicit that decoding must operate on encoded data, and Return Mail's construction "decipher" addresses this.  For example, Claim 42 recites "decoding

32

the encoded data incorporated in at least one of the undeliverable mail items."  Decipher is a term that inherently recognizes that it works on a coded message.

Defendant's own extrinsic evidence confirms that Plaintiff's proposed construction is superior.  Defendant offers several definitions from *Merriam Webster's Collegiate Dictionary*.  First, "decode" is defined as "to convert (*as a coded message*) into intelligible form."  *Merriam Webster 's Collegiate Dictionary*, 299 (10th ed. 1997) (emphasis added).  However, Defendant failed to include the "as a coded message" portion in its construction.  Moreover, the second definition of "decode" is defined as "decipher."  *Id.*  Both of these definitions confirm that Plaintiff's construction of "decode" as "decipher information into usable form" is more appropriate than  Defendant's construction of  "decode" as "convert [some kind of] information into usable form."  While the parties' proposed constructions are similar, Return Mail's construction more closely follows the customary meaning of the terms and comports with the claim language.

> **F.     The Terms "If The Sender Wants A Corrected Address Provided" and "If The Sender Does Not Want a Corrected Address Provided" have Plain and Ordinary Meanings that Need No Further Construction**

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
|---|---|---|
| Claim 42: "if the sender wants a corrected address provided" and "if the sender does not want a corrected address provided." | Plain and ordinary meaning. | Plain and ordinary meaning (mutually exclusive alternatives) |

Claim 42 reads:

> A method for processing a plurality of undeliverable mail items, comprising:
> > receiving from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;

33

identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;

decoding the encoded data incorporated in at least one of the undeliverable mail items;

creating output data that includes a customer number of the sender and at least a portion of the decoded data;

determining if the sender wants a corrected address provided for intended recipients based on the decoded data;

**if the sender wants a corrected address provided**, electronically transferring to the sender information for the identified intended recipients that enable the sender to update the sender's mailing address files; and

**if the sender does not want a corrected address provided**, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.

'548 Patent, Claim 42 (terms to be construed have been bolded).

The claim recites "A method for processing a plurality of undeliverable mail items, *comprising*." The Federal Circuit has explained that "[i]n the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'" *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007); *KIS, S.A. v. Foto Fantasy, Inc.*, 60 Fed. Appx. 319, 323 n. 3 (Fed. Cir. 2003) ("Because claim 1 was drafted using the recognized term of art 'comprising' in the transitional language, it is an 'open' claim that must be construed as including the recited elements, but not excluding the additional, unrecited elements."). Moreover, the Federal Circuit has cautioned that courts must "take care not to import limitations into the claims from the specification." *Abbott Labs.*, 566 F.3d at 1288.

Claim 42 also recites, *inter alia*, two steps that are performed on a plurality of mail items. First, "if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to update the sender's mailing address files." Second, "if the sender does not want a corrected address provided, posting return mail data records on a network that is accessible to the sender to enable the sender

34

to access the records." Both parties agree that these limitations should be accorded their plain and ordinary meaning. Defendant, however, would insert an additional ambiguous and unsupported restriction that these limitations are "mutually exclusive alternatives." Only Return Mail's construction is supported by the claim language and specification.

As an initial matter, the claim does not state or suggest that these two limitations should be given anything other than their plain and ordinary meaning. The specification details the processing logic for updating address records associated with returned mail. *See* '548 Patent, fig. 3, 4:50-5:13. In that embodiment, returned mail data records are placed on a website for sender pickup both if the sender wants (Box 314) or does not want (Box 304) a corrected address to be provided for the intended recipient.



FIG. 3

By contrast, Defendant's construction is inconsistent with the language of the claims and the specification and improperly rewrites the claim language by reading in a requirement that the

alternatives are mutually exclusive, which violates basic claim construction principles. *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (explaining that comprising means including but not limited to); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (courts may not import limitations from the specification into the claim).

Defendant's failure to provide a substantive construction for this term demonstrates that its proposal would require wholly rewriting the claim language. Accordingly, Defendant's proposed construction adds nothing to clarify the meaning of the term, and there is no need to depart from the plain and ordinary meaning of the claim.

Defendant's proposed construction fails to articulate how these limitations are "mutually exclusive." If Defendant intends that the *consequences* are mutually exclusive,[3] then Defendant's proposed construction would rewrite the claim and exclude the embodiment disclosed above in figure 3. For example, to achieve Defendant's intended meaning, the first step would have to be rewritten (emphasized portion added):

> "if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to update the sender's mailing address files *and not posting return mail data records on a network that is accessible to the sender to enable the sender to access the records*."

---

[3]    Defendant fails to specify whether it contends that these limitations are directed to mutually exclusive conditions or to mutually exclusive consequences. If Defendant intends that only the conditions be mutually exclusive, then there is little disagreement between the parties. For any given mail item, a sender cannot both "want" and "not want" a "corrected address provided." The conditions are therefore "mutually exclusive," but this construction would add nothing to the ordinary meaning of the limitations. Accordingly, Return Mail suggests that there is no need to inject a redundant restriction into the plain language of the claims.

Rewriting the claims in such a manner is not permitted. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

Moreover, Defendant's construction would further exclude the embodiment depicted in Figure 3 from the scope of Claim 42, a result that "is rarely, if ever, correct." *Vitronics Corp.*, 90 F.3d at 1583. It "would require highly persuasive evidentiary support" to exclude an embodiment. *Id.*  However, Defendant has failed to cite persuasive support, let alone highly persuasive support.  Defendant's proposed construction rewrites the claim importing unsupported limitations that conflict with the specification.  Defendant's proposal should therefore be rejected, and the plain and ordinary meaning of the term, which the intrinsic evidence supports, should be adopted.

### G.  "Posting Return Mail Data Records on a Network That Is Accessible to a Sender" has a Plain and Ordinary Meaning that Needs No Further Construction

| Relevant Claim Term | RMI's Proposed Construction | USPS's Proposed Construction |
| --- | --- | --- |
| Claim 42:  "posting return mail data records on a network that is accessible to the sender." | Plain and ordinary meaning | Posting decoded data on a network that is accessible to the sender |

Claim 42 reads:

> A method for processing a plurality of undeliverable mail items, comprising:
> receiving from a sender a plurality of mail items, each including: i) a written addressee, and ii) encoded data indicating whether the sender wants a corrected  address to be provided for the addressee;
> identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;
> decoding the encoded data incorporated in at least one of the undeliverable mail items;

37

> creating output data that includes a customer number of the sender and at
>    least a portion of the decoded data;
>
> determining if the sender wants a corrected address provided for intended
>    recipients based on the decoded data;
>
> if the sender wants a corrected address provided, electronically
>    transferring to the sender information for the identified intended
>    recipients that enable the sender to update the sender's mailing address
>    files; and
>
> if the sender does not want a corrected address provided, **posting return
>    mail data records on a network that is accessible to the sender to
>    enable the sender to access the records**.

'548 Patent, Claim 42 (terms to be construed have been bolded).

The language of the claim itself, as well as the specification, demonstrate that the phrase

"posting return mail data records on a network that is accessible to the sender to enable the

sender to access the records" has an ordinary and customary meaning.  Each term of the

disputed claim phrase is well-known.  Indeed, Defendant agrees that the claim term, except for

the term "return mail data records," should be given its plain and ordinary meaning.

Figure 3 of the specification illustrates that "return mail data records" have a commonly

understood meaning.  Figure 3 (as well as the text description at column 4, line 50 through

column 5, line 13) is an exemplary embodiment that "illustrates the processing logic for updating

address records associated with returned mail."  '548 Patent 2:40-42.  Figure 3 and the

accompanying text blocks simply state "place returned mail data records on internet website or

dial-up server for sender pickup."  Figure 3 (block 314).

The specification further makes clear that data records pertaining to return mail are

posted on a network.  For example, the specification states that "[t]he return mail service

provider then electronically transfers corrective data records to the subscriber," '548 Patent 5:8-

10, and that "[t]he returned mail data records are then placed on the Internet website of the

service provider or dialup service for sender pickup."  '548 Patent 5:8-10.  Nothing in the claim

38

language or the specification suggests that this claim term has anything other than its plain and ordinary meaning.

The Defendant's proposal erroneously equates "decoded data" with "return mail data records," both of which appear in Claim 42. Construing "return mail data records" to mean "decoded data" would violate the well-known principle that different claim terms should be construed to have different meanings. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings . . . .").

The claim language does not support Defendant's construction. Claim 42 references both "decoded data" and "return mail data records." However, the claim language provides no indication that these terms are synonymous. Claim 42 recites a method that includes steps for (1) "creating an output file that includes a portion of the decoded data," and 2) "determining-based on the decoded data- whether the sender wants a corrected address. There is no evidence to support an argument that the output file or any decoded data is posted on a network.

The specification does not support Defendant's position. It states that "[u]pon receiving updated addresses, the new address data is delivered to the subscriber in electronic form for [use] in updating the subscriber's customer address files." '548 Patent 2:23-25. The specification goes on to describe an exemplary embodiment, stating that "data records for successfully decoded items are saved for later retrieval with the items themselves routed to a success read." '548 Patent 6:21-24. Nothing supports the idea that decoded data or the saved files with decoded data are posted on a network.

In addition, Defendant's proposal introduces ambiguity to the claim term. What type of "decoded data" is posted to the network? Defendant's construction fails to specify that return

39

mail data records are posted to the network and fails to provide any clarity as to the meaning of the phrase "return mail data records."

Accordingly, the term . "posting return mail data records on a network that is accessible to the sender" has a plain and ordinary meaning and needs no further construction.

## IV.    Conclusion

For the foregoing reasons, Return Mail respectfully submits that the Court should adopt each of Return Mail's proposed claim constructions.

DATED:  October 1, 2012

Respectfully submitted,

/s/ George F. Pappas
George F. Pappas
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 662-6000
gpappas@cov.com
Counsel of Record for Return Mail, Inc.

*Of Counsel:*
Sarah L. Wilson
Roderick R. McKelvie
Uma N. Everett
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 662-6000
swilson@cov.com
rmckelvie@cov.com
ueverett@cov.com